1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  ADAM SHAPIRO (SBN 267429)
   ashapiro@cpmlegal.com
3  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
4  840 Malcolm Road
   Burlingame, CA 94010
5  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
6
   BRIAN S. KABATECK (SBN 152054)
7  **KABATECK BROWN KELLNER LLP**
   Engine Company No. 28 Building
8  644 South Figueroa Street
   Los Angeles, CA 90017
9  Telephone: 866-266-1800

10 BRANDON C. FERNALD (SBN 222429)
   **FERNALD LAW GROUP**
11 510 W 6th Street, Suite 700
   Los Angeles, California 90014
12 Telephone: 323 410-0320

13 *Attorneys for Relators*

   LA CV17 08446-PSG-JPRx

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* [UNDER SEAL]<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL]<br><br>Defendant. | CASE NO. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, VIOLATIONS OF THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT, RETALIATION, AND WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br><br>**DEMAND FOR JURY TRIAL** |

**[FILED IN CAMERA AND UNDER SEAL**

**PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

**COMPLAINT**

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 1 |
| III. | PARTIES | 2 |
| IV. | OVERVIEW OF THE SCHEME | 3 |
| | A. THE UNITED STATES MEDICARE SYSTEM | 3 |
| | B. PLATELET RICH PLASMA ("PRP") | 4 |
| | C. BONE MARROW ASPIRATE CONCENTRATE ("BMAC") | 5 |
| | D. DEFENDANTS' UPCODING SCHEME | 6 |
| | E. HARVEST AND TERUMO CONSPIRE WITH HBA TO PROVIDE FRAUDULENT BILLING INSTRUCTIONS | 8 |
| | F. TERUMO AND HARVEST ATTEMPT TO REPLACE HBA | 10 |

FIRST CAUSE OF ACTION
On Behalf of the United States against All Defendants
Federal False Claims Act, Presenting False Claims
31 U.S.C. § 3729(a)(1)(A) .......................................................................... 11

SECOND CAUSE OF ACTION
On Behalf of the United States against All Defendants
Federal False Claims Act, Making or Using False Records or Statements
Material to Payment or Approval of False Claims
31 U.S.C. § 3729(a)(1)(B) .......................................................................... 12

THIRD CAUSE OF ACTION
On Behalf of the United States against All Defendants
Conspiracy to Violate the False Claims Act
31 U.S.C. § 3729(a)(1)(C) .......................................................................... 12

FOURTH CAUSE OF ACTION
On Behalf of the State of California against All Defendants
Violation of the Insurance Fraud Prevention Act (Cal. Ins. Code § 1871.7(b)) ........ 13

FIFTH CAUSE OF ACTION
On Behalf of Charles Puhl against Terumo BCT
Wrongful Retaliation In Violation Of The False Claims Act
31 U.S.C. § 3730(h) .................................................................................. 14

SIXTH CAUSE OF ACTION
On Behalf of Charles Puhl against Terumo BCT
Wrongful Termination in Violation of Public Policy..................................................14

VI. PRAYER FOR RELIEF ........................................................................................14

VII. JURY DEMAND ..................................................................................................17

## I. INTRODUCTION

1. Relator Charles Puhl ("Relator") brings this action on behalf of the United States and pursuant to California Insurance Code § 1871.7(b) to recover losses sustained by the Medicare Program and private insurers as a result of the operations of Defendants Terumo BCT, Terumo Corporation, Terumo Americas Holding, Inc. (collectively, "Terumo"), Harvest Technologies Corporation, and Health Benefit Advocates, Inc. ("HBA").

2. Over the course of at least the last 13 years, Defendants have defrauded the government and private insurers by causing healthcare providers to submit to Medicare and private insurers incorrect billing codes for Bone Marrow Aspirate Concentrate ("BMAC") and Platelet Rich Plasma ("PRP") therapies.

3. Both BMAC and PRP are generally not covered by either private or public insurance, making their cost prohibitive. To induce providers to prescribe the treatments, Defendants falsely represented that they were covered by Medicare and private insurance, and instructed providers to use billing codes for other, covered treatments.

4. Specifically, Defendants instructed health care providers to bill BMAC as a bone graft surgical treatment, and to bill PRP as an autologous hemocyte tissue graft or therapeutic apheresis. In fact, BMAC is a different and distinct procedure from a bone graft procedure. Likewise, PRP, hemocyte tissue grafts, and therapeutic apheresis are different and unrelated procedures. The sole reason Defendants instructed providers to use the billing codes for bone grafts, hemocyte tissue grafts, and therapeutic apheresis is that those procedures are covered by Medicare and private insurance, which BMAC and PRP are not.

5. When Relator refused to participate in Defendants fraudulent scheme, Terumo BCT retaliated against him by wrongfully terminating his employment

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the False Claims Act ("FCA") causes of action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law. This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the FCA on the District Courts of the United States.

COMPLAINT 1

7. Additionally, this Court has supplemental jurisdiction over the other claims in this action pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in the action that they form part of the same case or controversy.

8. Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact business in this district.

## III. PARTIES

9. The Plaintiffs in this action are the United States of America ("United States") and the State of California by and through Relator Charles Puhl.

10. Harvest Technologies Corporation ("Harvest") is a Delaware Corporation based in Plymouth, Massachusetts that does significant business in this district. Harvest was acquired by Terumo Americas Holding in 2011, and became a subsidiary of that corporation. In or around early 2014, the Harvest subsidiary was transferred from Terumo Americas Holding to another Terumo entity, Terumo BCT.

11. Defendant Terumo Corporation is a Japanese Corporation, based in Tokyo, Japan, which manufactures and sells medical equipment. Terumo Corporation has a number of subsidiaries worldwide, including Terumo BCT and Terumo Americas Holding, Inc. in the United States.

12. Defendant Terumo Americas Holding, Inc., is a Delaware Corporation that does significant business in this district. Terumo Americas Holding Inc.'s parent company is Defendant Terumo Corporation. In 2011, Terumo Americas Holding Inc. entered into a stock purchase agreement to acquire all outstanding shares of Harvest Technologies Corporation.

13. Defendant Terumo BCT is Colorado Corporation that does significant business in this district. Terumo BCT markets itself as a "global leader in blood component, therapeutic apheresis and cellular technologies." Its customers include blood centers, hospitals, therapeutic apheresis clinics, cell collection and processing organizations, researchers and private medical practices in more than 130 countries. Terumo BCT's parent company is Defendant Terumo Corporation. In or around early 2014, Harvest became a "Terumo BCT Company."

14. Defendant Health Benefit Advocates, Inc. ("HBA") is a Colorado Corporation which does business in California. HBA is owned and operated by Phillip Zarlengo.

15. Relator Charles Puhl began working for Harvest in or around January 2001 as a sales representative and then as a Territory Manager for California, Nevada, Arizona, Colorado, and Hawaii. He continued to work for Harvest after it was acquired by Terumo in 2011, and after it became a Terumo BCT Company in or around 2014. In or around April 2015, Puhl was promoted to Regional Sales Manager (West Region) for Terumo BCT, where he managed sales in the Western United States from Colorado to Hawaii. In that position, Puhl worked under John Utvich, Terumo BCT's Global Director of Sales, and Puhl oversaw sales to private practices, surgery centers, and hospitals. Puhl was wrongfully terminated by Terumo BCT on July 17, 2017, after he refused to take part in Defendants' unlawful billing scheme.

## IV. OVERVIEW OF THE SCHEME

### A. THE UNITED STATES MEDICARE SYSTEM

16. Medicare is a federally-funded health care program that provides medical insurance coverage to qualified residents of the United States who are aged 65 and older, younger people with permanent or congenital disabilities, or those who meet other special criteria like the End Stage Renal Disease program. The vast majority of Medicare's costs are paid by United States citizens through their taxes. Medicare pays for medical expenses, such as doctor visits and hospital stays.

17. Title XVII of the Social Security Act establishes the Medicare Program (technically, the "Health Insurance for the Aged and Disabled Program"). See 42 U.S.C. § 1397 *et seq.*

18. The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the operating division of the United States Department of Health & Human Services ("HHS"). CMS, in turn, contracts out to Medicare Administrative Contractors ("MACs"), also known as carriers, to review, approve, and pay Medicare claims received from healthcare providers.

19. Medicare payments are typically made directly to healthcare providers rather than the patient, as Medicare recipients routinely assign their right to payment to the healthcare provider. Once a Medicare recipient assigns their right to payment to a provider, the provider then submits its bill directly to Medicare for payment

20. To bill Medicare, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When submitting the form, the provider must certify that the services in question were "medically indicated and necessary for the health of the patient."

21. The CMS-1500 form requires the provider to state, among other things, the procedure(s) for which it is billing Medicare, the provider number, the identity of the patient, and a short narrative explaining the diagnosis and the medical necessity of services that the provider rendered.

22. All healthcare providers must comply with all applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare. Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding coverage for Medicare services.

23. For example, Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. See 42 U.S.C. § 1395y(a)(1)(A); see also 42 C.F.R. § 411.115(k). Providers must also assure that they provide medical services to Medicare recipients "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

24. Because it is not realistically feasible to review medical documentation before paying each claim, MACs generally make payment under Medicare based on the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient."

**B. PLATELET RICH PLASMA ("PRP")**

25. Platelet-rich plasma (PRP) is a concentrate of platelets in blood plasma derived from whole blood, centrifuged to remove red blood cells and concentrate platelets in plasma. It has been used to encourage a brisk healing response across several specialties, in particular cardiovascular surgery, sternal wound closure, orthopedic surgery, spine surgery, dermatology, and oral surgery.

**COMPLAINT**  4

26.  Specifically, PRP has been used in sports medicine and orthopedics to treat acute muscle strains, tendinopathy and muscle-fascial injuries, and osteoarthritis, and to speed wound and bone graft healing. PRP's main uses in dermatology are for androgenic alopecia, wound healing, and skin rejuvenation.

27.  For preparation of PRP, various protocols are used, with an underlying principle of concentrating platelets to 3 to 5 times physiological levels, then injecting this concentrate in the tissue where healing is desired.

28.  In or around 2000, Harvest began marketing and selling the Harvest Platelet Concentrate System, also known as "SmartPReP" system, which allowed physicians to prepare highly concentrated, autologous PRP. Harvest represented that the system could be used to naturally stimulate the body's healing process for bone and soft tissue wounds.

29.  After Harvest was acquired by Terumo in 2011, Harvest and Terumo continued to market and sell its "SmartPreP" PRP system. Harvest and Terumo continue to market and sell the system today.

30.  The clinical utility of PRP has yet to be established and is considered experimental. A 2014 analysis for PRP found there is currently insufficient evidence to support the use of PRP for treating musculoskeletal soft tissue injuries.[1] A 2015 meta-analysis reviewed 551 studies on PRP for osteoarthritic (OA) knee and found that only nine were worth considering and concluded that with respect to short term outcomes, PRP was not more efficacious than a placebo.[2]

31.  When billed correctly, PRP is not covered by either Medicare, and is generally not covered by private insurance.

C.  **BONE MARROW ASPIRATE CONCENTRATE ("BMAC")**

32.  Bone Marrow Aspirate Concentrate ("BMAC") therapy is a non-surgical regenerative treatment used to treat ortho spine bone fusion cases and various other orthopedic

---

[1] Moraes, Vinicius Y. et al., *Platelet-rich therapies for musculoskeletal soft tissue injuries*, Cohrane Bone, Join and Muscle Trauma Group (Apr. 29, 2014).

[2] Kanchanatawan, W; Arirachakaran, A; et al., (May 2016) *Short-term outcomes of platelet-rich plasma injection for treatment of osteoarthritis of the knee*, Knee surgery, sports traumatology, arthroscopy : official journal of the ESSKA. 24 (5): 1665–77.

**COMPLAINT**  5

injuries, like osteoarthritis. As part of the therapy, a physician removes a small amount of the patient's bone marrow, places the bone marrow in a centrifuge, and then injects the resulting concentrate into an injured area.

33. Prior to the procedure, a patient is given local anesthesia to numb the area where the aspiration will take place. This is typically at the top ridge of the rear of the hipbone. Occasionally, the aspiration is taken from the chest bone. An incision is made at the donor site to make it easier for a bone marrow aspirate needle to go into the patient's skin. The needle then goes into the bone. A syringe on the back of the needle is used to draw out the fluid portion of the marrow.

34. In or around 2006, Harvest began manufacturing, marketing, and selling the Harvest BMAC System, also known as the SmartPReP 2 BMAC technology platform, a BMAC kit which is advertised as a point-of-care device that requires just 15 minutes to process and concentrate adult stem/progenitor cells from a small aspirate of autologous bone marrow.

35. After Harvest was acquired by Terumo in 2011, Harvest and Terumo continued to sell and market the Harvest BMAC System. They continue to sell the kit up to and through the present.

36. The BMAC kit sold by Harvest and Terumo includes a "BMAC process," an 11-gauge 5-port aspiration needle with trocar and blunt tip style, and a 15-gauge BMA needle with depth stop. In connection with the kit, Harvest and Terumo also market and sell a topical spray system, liquid application systems, and "graft delivery packs."

37. Harvest and Terumo's BMAC kit can be purchased by medical providers for about $2,300 to $3,000. However, when properly billed, Medicare does not reimburse providers for the kit or the BMAC procedure.

### D. DEFENDANTS' UPCODING SCHEME

38. To convince physicians, surgery centers, and hospitals to use Terumo and Harvest's PRP and BMAC treatments, despite the fact that such treatments are not covered by Medicare or private insurance, Defendants concocted an upcoding scheme. Pursuant to the scheme, Defendants instructed medical providers to bill BMAC and PRP using billing codes for other procedures

COMPLAINT 6

which are covered by Medicare and private insurers.  These other procedures are in fact different and distinct from BMAC and PRP.  Thus, there is no basis for providers to use the billing codes provided by defendants when treating patients using PRP and BMAC therapies.

39.     Specifically, Defendants instructed medical providers to bill PRP as a type of tissue graft known as an "autologous hemocyte tissue graft," using the CPT code 20926 (the code for "removal of tissue for graft").  A hemocyte is a blood cell or blood tissue.  An autologous hemocyte tissue graft is tissue components of a patient's "buffy coat," which includes leukocytes, erythrocytes, fibrinogen, platelets, and plasma.  It provides a concentrated harvested tissue to be used as living tissue graft.  The graft is immediately implanted in the patient by a surgeon to seal, fill, and replace tissue lost due to injury with autologous cells that are compatible with the patient's physiology.  Autologous hemocyte tissue grafts are different than and distinct from PRP.  Indeed, blood is not even considered "tissue."

40.     Additionally, Defendants sometimes instructed providers to bill PRP as therapeutic apheresis, using the CPT code 36511 (the code for "apheresis wbc [whole blood cells]".) Thereapeutic apheresis is different than and distinct from PRP.  Therapeutic apheresis is the process of transiently removing whole blood from the body, separating it into various components (e.g., cells, plasma, proteins, antibodies, antigen-antibody complexes, lipids, etc.), removing those components that contribute to disease, and then returning the remaining blood with possible addition of a blood component to the body.

41.     While Medicare and private insurance do not reimburse for PRP, they do reimburse for autologous hemocyte tissue graft and therapeutic apheresis procedures.  For example, the reimbursement rate for CPT code is 20926 is $392 to $551, and the reimbursement rate for CPT code 36511 is $90 to $129.

42.     Likewise, Defendants instructed medical providers to bill BMAC as something else, specifically a bone graft procedure.  In contrast to BMAC therapy, bone grafting is a surgical procedure that replaces missing bone in order to repair bone fractures that are extremely complex, pose a significant health risk to the patient, or fail to heal properly.

43. Bone grafts may be autologous (bone harvested from the patient's own body), allograft (cadaveric bone usually obtained from a bone bank), or synthetic with similar mechanical properties to bone. Most bone grafts are expected to be reabsorbed and replaced as the natural bone heals over a few months' time. To perform a bone graft, a surgeon will make an incision in the patient's skin, above where the graft is needed. The surgeon will then surgically remove bone from the donor site using a mallet or chisel. Thereafter, the surgeon will shape the donated bone to fit the area, and secure the graft in place with pins, plates, screws, wires, or cables. The procedure is generally performed under general or local anesthesia.

44. Unlike BMAC, surgical bone graft procedures are generally covered by Medicare and private insurers. There are a variety of CPT codes associated with bone grafts, including 20900 ("removal of bone for graft"), 20902 ("removal of bone for graft"), 20955 ("fibula bone graft microvasc"), 20956 ("Iliac bone graft microvasc"), 20962 ("other bone graft microvasc"), 20969 ("bone/skin microvasc"), 20970 ("bone/skin graft iliac crest"), 20972 ("bone/skin graft metatarsal"), 20973 ("bone/skin graft great toe"). The Medicare reimbursement rates for these CPT codes range from $375 to $3,808. In total, medical providers may be reimbursed up to $6,000 for the entire BMAC procedure.

### E. HARVEST AND TERUMO CONSPIRE WITH HBA TO PROVIDE FRAUDULENT BILLING INSTRUCTIONS

45. Defendant Health Benefit Advocates ("HBA") played a key role in Defendants' upcoding scheme. HBA is owned and operated by Phillip Zarlengo. In 2004, Zarlengo pleaded to one count of Medicare fraud in an unrelated case and was sentenced to five months in prison and 3 years of supervised release.

46. In or around 2004 or 2005, Frank Stephenson, a Vice President of Sales at Harvest, reached out to Zarlengo and HBA about promoting the sale of Harvest's PRP product. Harvest and HBA reached an agreement whereby Harvest would pay HBA a $10,000 monthly fee, plus commission to provide fraudulent billing instructions to medical providers who used Harvest's PRP products.

**COMPLAINT**  8

47. The billing instructions provided by HBA directed providers to bill PRP as an "autologous hemocyte tissue graft." As discussed above, PRP and autologous hemocyte tissue grafts are different and distinct procedures. Using the instructions provided by HBA, providers would receive reimbursement for PRP from Medicare and private insurers. If these procedures had been properly billed, providers would not have been reimbursed by Medicare or private insurers. Defendants continued to provide doctors with fraudulent billing instructions concerning PRP through approximately 2015.

48. In or around 2006, HBA and Harvest expanded the upcoding scheme to BMAC. As with PRP, Harvest paid HBA a monthly fee and commissions to instruct medical providers to bill BMAC as a bone graft procedure. Physicians using these fraudulent instructions were reimbursed by Medicare and private insurers for BMAC, even though BMAC was not a covered procedure.

49. Stephenson knew that HBA was providing physicians with fraudulent billing instructions and incorrect CPT codes. Indeed, this was the very reason that Stephenson hired HBA to provide billing instructions to physicians and medical providers. Stephenson was also aware of Zarlengo's felony conviction.

50. Other high-level officers at Harvest were also aware of and participated in the scheme, including Tim Mueller, the director of marketing at Harvest, Steve Whyte, director of sales at Harvest, and Ed Valigusky, Whyte's successor.

51. After Terumo acquired Harvest, the scheme continued and Terumo became an active participant. Relator has firsthand knowledge of Terumo's involvement, as he worked for Terumo Americas Holding and Terumo BCT after the acquisition.

52. Several high-level officers within the Terumo organization were aware of or involved in the scheme, including John Utvich, the Global Director of Sales at Terumo BCT, Pat Elliot, the CEO Terumo Americas Holding installed at Harvest after the company was acquired, and Michelle Sullivan, Harvest's head of marketing from 2011 to 2014.

53. Defendants provided fraudulent billing instructions to customers in California and nationwide. Defendants' customers included St. Mary's Medical Center, San Francisco, California; Healthways Medical Group ("Healthways"), Whittier, California; San Ramon Regional

**COMPLAINT** 9

Medical Center, San Ramon, California, Millennium; Surgery Center, Bakersfield, California; Eden Medical Center, Castro Valley, California; Stanford Medical Center, Stanford, California; Dignity Health, Rancho Cordova, California; Alta Bates Summit Medical Center, Berkeley, California; Teaneck Surgical Center, Teaneck, New Jersey; and Smoke Ranch Surgery Center, Las Vegas, Nevada.

54. Edwin Chun, the owner of Healthways, complained to Puhl after Blue Cross/Blue Shield informed Chun that Healthways had been incorrectly billing PRP as a tissue graft procedure. Blue Cross/Blue Shield demanded that Healthways return $80,000 in reimbursements that had been paid as a result of the incorrect billing codes supplied by Defendants and submitted by Healthways.

### F. TERUMO AND HARVEST ATTEMPT TO REPLACE HBA

55. At one point, after the Harvest acquisition, officers at Terumo became concerned about HBA's role in the scheme due to Zarlengo's felony conviction. Terumo and Harvest feared that Zarlengo's involvement would draw the attention of law enforcement.

56. Terumo began exploring possibilities for replacing HBA. John Utvich, Terumo BCT's Global Director of Sales, approached several organizations about taking over HBA's role in the scheme. Thus far, Terumo has been unsuccessful in its attempts to replace HBA.

57. One of the entities approached by Terumo was Musculoskeletal Clinical Regulatory Advisers, LLC ("MCRA"). MCRA refused to participate in the scheme, stating that it could not provide the kind of billing advice that HBA had been providing customers because such advice was not legally supported. In spite of this admonition, Terumo continued to pay HBA to provide billing instructions to providers.

58. In or around the spring and summer of 2017, Terumo approached Relator about finding a replacement for HBA; however, Terumo planned to continue the fraud. Specifically, officers at Terumo BCT, including Tim Mueller and John Utvich, directed Relator to ask his sister, Erin Chancler, to pose as a BMAC customer and contact HBA in order to obtain the fraudulent billing codes. Chancler is an Administrator for a Skilled Nursing Facility. Terumo wanted Chancler to pose as a doctor and collect all of the information that HBA had been providing to

**COMPLAINT** 10

customers. Terumo's sales people would then relay the information directly to their customers, and cut out HBA as the middleman. On June 29, 2017, Mueller sent Puhl an email asking "what you got set up with your sister/HBA."

59.     Relator told Utvich that he would not involve his sister in the scheme, and was terminated by Terumo BCT soon thereafter, in July 2017. The stated reasons for Relator's termination was that he exercised poor managerial judgment because he had used his corporate credit card to buy coworkers drinks and appetizers at certain events. In fact, this was a normal and accepted practice at Terumo BCT. The real reason for Relator's termination was that he had declined to participate in Terumo BCT's fraudulent billing scheme.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**On Behalf of the United States against All Defendants**

**Federal False Claims Act, Presenting False Claims**

**31 U.S.C. § 3729(a)(1)(A)**

60.     Relator incorporates herein by reference and realleges the above allegations.

61.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

62.     Defendants knowingly presented or caused to be presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program for BMAC and PRP procedures.

63.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

///

///

///

COMPLAINT

## SECOND CAUSE OF ACTION

**On Behalf of the United States against All Defendants**

**Federal False Claims Act, Making or Using False Records or Statements**

**Material to Payment or Approval of False Claims**

**31 U.S.C. § 3729(a)(1)(B)**

64. Relator incorporates herein by reference and realleges the above allegations.

65. Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

66. Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare program for BMAC and PRP procedures.

67. The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## THIRD CAUSE OF ACTION

**On Behalf of the United States against All Defendants**

**Conspiracy to Violate the False Claims Act**

**31 U.S.C. § 3729(a)(1)(C)**

68. Relator incorporates herein by reference and realleges the above allegations.

69. Defendants, between and amongst themselves, and others, conspired to defraud the United States by: (1) presenting or causing to be presented false claims for payment or approval to an officer or employee of the United States, (2) making, using, or causing to be made or used false records or statements material to false or fraudulent claims.

70. Defendants, between and amongst themselves, and others agreed to provide medical providers with fraudulent billing instructions for PRP and BMAC procedures.

71. At least one overt act was taken in furtherance of this agreement. Terumo and Harvest paid HBA a monthly fee and commissions to provide fraudulent billing instructions, and HBA did in fact provide fraudulent billing instructions to medical providers.

COMPLAINT

72. As a result of Defendants' actions, the United States has been and will continue to b, severely damaged.

## FOURTH CAUSE OF ACTION

**On Behalf of the State of California against All Defendants**

**Violation of the Insurance Fraud Prevention Act (Cal. Ins. Code § 1871.7(b))**

73. Relator incorporates herein by reference and realleges the above allegations.

74. By virtue of the conduct alleged herein, Defendants, and each of them intentionally and repeatedly violated California Insurance Code § 1871.7(b) in that Defendants, and each of them, knowingly violated California Penal Code § 550 by engaging in the following conduct:

   a. Knowingly presenting or causing to be presented false or fraudulent claims for the payment of a loss or injury under a contract of insurance; and/or

   b. Knowingly preparing, making or subscribing writings, with the intent to present or use them, or allow them to be presented, in support of a false or fraudulent claim; and/or

   c. Presenting or causing to be presented written or oral statements as part of, or in support of claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains false or misleading information concerning material facts; and/or

   d. Preparing or making any written or oral statements that were intended to be presented to an insurer in connection with, or in support of, claims or benefits pursuant to an insurance policy, knowing that the statement contain false or misleading information concerning material facts; and/or

   e. Aiding, abetting, soliciting, assisting, or conspiring with any person to engage in (a) through (d) above.

75. As a result of such conduct on the part of Defendants, the State of California has been damaged in substantial amounts, and is entitled to damages and penalties in accordance with California Insurance Code § 1871.7, to be determined at trial.

**COMPLAINT** 13

## FIFTH CAUSE OF ACTION

## On Behalf of Charles Puhl against Terumo BCT

## Wrongful Retaliation In Violation Of The False Claims Act

## 31 U.S.C. § 3730(h)

76. Puhl incorporates herein by reference and realleges the above allegations.

77. Terumo BCT is covered by the retaliatory discharge statute, 31 U.S.C. § 3730(h).

78. Through reporting, investigating, complaining of, and attempting to stop the fraudulent conduct of Defendants, Puhl was retaliated against, discharged, and discriminated against in the terms of his employment by Terumo BCT because of lawful and protected conduct and acts done by Puhl in furtherance of an action under 31 U.S.C. § 3729.

79. Puhl is entitled to all relief necessary to make him whole, including but not limited to reinstatement with the same seniority status he would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

## On Behalf of Charles Puhl against Terumo BCT

## Wrongful Termination in Violation of Public Policy

80. Puhl incorporates herein by reference and realleges the above allegations.

81. Puhl was employed by Terumo BCT

82. Terumo BCT discharged Puhl.

83. Puhl's refusal to engage in Terumo BCT's fraudulent billing scheme in violation of Federal and State law was a substantial motivating reason for Puhl's discharge.

84. The wrongful discharged caused Puhl harm.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through the Relator, prays judgment in its favor and against Defendants as follows:

1. That judgment be entered in favor of Plaintiff United States Of America *ex rel.* Charles Puhl, and against Defendants Terumo BCT, Inc., Terumo Corporation, Terumo Americas

COMPLAINT 14

Holding, Inc., Harvest Technologies Corporation, Health Benefit Advocates, Inc, according to proof on the first, second, and third causes of action for damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

    i.    Triple the amount of damages sustained by the United States;

    ii.    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

    iii.    Recovery of costs, attorney's fees, and expenses;

    iv.    Pre- and post-judgment interest;

    v.    Such other and further relief as the Court deems just and proper.

2.    Further, as to the First, Second, and Third Causes of Action, Relator on his own behalf, requests that he receives such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for his reasonable expenses incurred, plus reasonable attorney's fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action. Relator also requests that he be awarded all costs of this action, including attorney's fees and expenses;

3.    That judgment be entered in favor of Plaintiff the State of California *ex rel.* Charles Puhl and against Defendants Terumo BCT, Inc., Terumo Corporation, Terumo Americas Holding, Inc., Harvest Technologies Corporation, Health Benefit Advocates, Inc., according to proof on the fourth cause of action for damages as provided by California Insurance Code § 1871.7(b), in the amount of:

    i.    Triple the amount of each claim for compensation;

    ii.    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

    iii.    Recovery of costs, attorney's fees, and expenses;

    iv.    Pre- and post-judgment interest;

    v.    Such other and further relief as the Court deems just and proper.

4.    Further, as to the fourth cause of action, Relator on his own behalf, requests that he receives such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the State of California, plus an amount for his reasonable expenses

incurred, plus reasonable attorney's fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action. Relator also requests that he be awarded all costs of this action, including attorney's fees and expenses;

5. That judgment be entered in favor Charles Puhl, and against Defendant Terumo BCT, according to proof on the fifth cause of action for damages as provided by 31 U.S.C. § 3730(h), as necessary to make him whole, including but not limited to reinstatement with the same seniority status he would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

6. That judgment be entered in favor of Charles Puhl, and against Defendant Terumo BCT according to proof on the sixth cause of action, and that Puhl be awarded

   i. General and compensatory damages, including prejudgment interest, according to proof;

   ii. Special damages according to proof, including, without limitation, lost salary, both front and back pay, bonuses, and any other benefits to which Puhl would have been entitled to by reason of his employment with Terumo BCT, according to proof; and

   iii. Punitive damages.

7. That Relator recover such other and further relief as the Court deems just and proper.

Dated: November 17, 2017          COTCHETT, PITRE & McCARTHY LLP

                                  By: /s/ signature
                                  NIALL P. McCARTHY
                                  ADAM M. SHAPIRO

                                  **KABATECK BROWN KELLNER LLP**
                                  BRIAN S. KABATECK

                                  **FERNALD LAW GROUP**
                                  BRANDON C. FERNALD

                                  *Attorneys for Relators*

COMPLAINT                                                                    16

## VII. JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: November 17, 2017

**COTCHETT, PITRE & McCARTHY LLP**

By: _____
NIALL P. McCARTHY
ADAM M. SHAPIRO

**KABATECK BROWN KELLNER LLP**
BRIAN S. KABATECK

**FERNALD LAW GROUP**
BRANDON C. FERNALD

*Attorneys for Relators*

COMPLAINT